# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 7, 2013

## STATE OF TENNESSEE v. MARQUON LANORRIS GREEN

**Appeal from the Circuit Court for Madison County**
**No. 11-360     Roy B. Morgan, Jr., Judge**

---

**No. W2012-01654-CCA-R3-CD  - Filed May 30, 2013**

---

The defendant, Marquon Lanorris Green, was convicted by a Madison County Circuit Court jury of aggravated kidnapping, a Class B felony; aggravated rape, a Class A felony; and aggravated robbery, a Class B felony.  He was sentenced to twenty years on the aggravated kidnapping and aggravated rape convictions and ten years on the aggravated robbery conviction, to be served consecutively to each other and a prior ten-year sentence.  On appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's imposition of consecutive sentences.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

George Morton Googe, District Public Defender; Jeremy B. Epperson (on appeal) and Susan D. Korsnes (at trial), Assistant Public Defenders, for the appellant, Marquon Lanorris Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On February 7, 2011, the twenty-two-year-old victim was accosted in a parking lot on the Lane College campus by a gun-wielding individual who demanded her purse and then forced her to drive to another area and perform oral sex on him.  The defendant was

identified as the suspect and indicted on charges of aggravated kidnapping, aggravated rape and aggravated robbery.

At trial, the victim testified that she was a student at Lane College in Jackson, Tennessee and that, on February 7, 2011, she drove to class in her gray Impala and parked in a campus lot between St. Paul's Church and the water tower. The victim had a class from 10:00 until 11:00 a.m. but got out early because it was snowing. After walking to her car, the victim started her engine and then got back out to clear the snow from the windows. She re-entered her car, but as she went to shut and lock the doors, her door "bounced back open" and a man, later identified as the defendant, was standing there pointing a gun in her face. She recalled that the gun was black with a gray strip.

The victim testified that the defendant, while holding a gun in her face, demanded her purse. The victim pleaded with the defendant not to shoot her and began to hand him her purse. As she handed the defendant her purse, she began spilling things out of it so she could attempt to hide her wallet. The defendant told her to put the items back in her purse. As she was doing so, her wallet fell out and she threw it underneath her car.

The victim testified that the defendant took the keys out of the ignition and told her that he would shoot her if she tried to get away. He then got into the passenger seat of the vehicle. The defendant placed the gun on his left leg next to the victim and said, "'My brother in jail. He need my help[.]'" The victim told him that God would help him and that God did not like guns, and she continued to plead with him not to kill her. As the defendant talked, the victim grabbed for the gun but was unable to get control of it. The defendant said to her, "'You're trying to kill me. You're trying to shoot me[.]'" The victim apologized and begged for her life.

The victim testified that she saw students walking to their vehicles and wanted to get their attention, so she told the defendant that she needed to urinate. The defendant allowed her to step outside her car, but he told her not to go anywhere and kept the gun pointed at her the entire time she was outside. She was unable to get anyone's attention. The defendant told her to get back into the car, and she complied. He then told her, "'You about to get ready to drop me off somewhere[.]'" The victim told him that she did not want to leave because she did not know her way around Jackson. The defendant again told the victim that she was going to take him somewhere.

The victim testified that, while holding the gun in his hand, the defendant directed her to drive out of the parking lot and turn right onto Middleton Street, turn right on Berry Street, and then turn left onto Rhone Street. The defendant told her to drive into the parking lot of an apartment complex, park, and turn off the engine. Once the victim parked, the

defendant told the victim, "'You're about to get ready to suck my dick[.]'" The victim responded that she was not going to do that. The defendant said to her, "'You got a tongue ring. You're about to get ready to suck my dick,'" and that he would shoot her if she refused. Afraid for her life, the victim did what the defendant asked. The defendant put his penis inside the victim's mouth, and the victim made herself gag and opened the door to throw up. The victim recalled that the defendant looked at her like he was disgusted and then pulled up his pants and told her that she was going to take him somewhere. The victim thought that the defendant was going to take her somewhere and kill her.

The victim testified that she drove up to the gate to leave the apartment complex, and the defendant got out of the car. The defendant left with her phone, camera, and charger, and she drove back to the school to get her wallet. When she arrived, she yelled and screamed for help. Two students responded, and she used one of their phones to call 911. Several police officers responded to the scene, and she told them that her assailant was wearing a black pullover, a gray skull cap, gray gloves, black denim jeans and tennis shoes. The next day, the victim was shown a photographic array, from which she identified the defendant as her assailant. On the back of the array she wrote, "'This is the guy from yesterday that robbed and kidnapped me and sexually assaulted me. I remember his beard, his eyes and the way his lips were made. He disgusts me.'"

On cross-examination, the victim acknowledged that, in a statement given to police two hours after the incident, she said that the defendant approached her as she "'was trying to get in the car and get the snow off [the] car . . . and made [her] get into the car.'"

Officer Gregory Adam Massey with the Jackson Police Department testified that he and Officers Arnold and Staton responded to the scene on February 7, 2011. They spoke to the victim inside St. Paul's Church, and she was "very upset." The victim wanted to speak to a female officer, so Officer Staton interviewed her. The victim described her assailant as "a black male about 5'6" to 5'8", about 150 to about 170 pounds." She reported that he was wearing a black coat, gray toboggan, gray gloves, black pants, and a black hooded sweatshirt.

Officer Massey testified that he was patrolling the area around Lane College the next morning when he encountered a man fitting the description of the assailant. The man, whom Officer Massey identified as the defendant, was approximately 5'6" or 5'7" and was wearing a gray toboggan, gray gloves, and black clothing. Officer Massey asked the defendant if he was armed, and the defendant said that he had a pistol in his right front pants pocket. Officer Massey secured the weapon, arrested the defendant on a gun charge, and transported him to the police station. He notified his supervisor, Investigator Aubrey Richardson, that the defendant was possibly the suspect in the victim's case.

Officer Michael Arnold with the Jackson Police Department testified similarly to Officer Massey, recalling their speaking to the victim at the scene and encountering the defendant the following day. Officer Arnold identified the Taurus nine-millimeter handgun that they confiscated from the defendant. He also identified the magazine and seven bullets that were in the gun.

Investigator Chris Chestnut with the Jackson Police Department testified that he assisted in the investigation in this case. On February 8, 2011, he learned that the defendant was in custody and went to the jail to retrieve some items of the defendant's clothing, namely, a pair of black jeans and a black hooded sweatshirt.

Investigator Aubrey Richardson with the Jackson Police Department testified that he investigated the offenses in this case. He responded to the scene and met with the victim, who was "very hysterical," inside St. Paul's Church. A female officer, Officer Staton, interviewed the victim at the scene, and then he spoke to the victim later at the hospital. He recalled that the victim was "still very upset" at the hospital.

Investigator Richardson testified that he learned the next day that the defendant had been arrested and that he matched the description of the suspect given by the victim. He also learned that the defendant had a weapon on his person at the time of his arrest. On February 8, 2011, Investigator Richardson spoke to the defendant at the criminal justice center. After the defendant was advised of and waived his rights, he provided the following statement:

> I, [the defendant], saw a black female walking out of the building up the stairs at Lane College and I was walking down the street. She was walking towards the parking lot by the water tower and she had a silver Impala. I was trying to talk to her and she was talking to me. We talked for 15 minutes while I was sitting in her passenger's seat. She was letting her snow melt off her car. And before I left, she got out of the car and peed in the parking lot. I did not tell her anything about my brother. He has been out of the pen for about three months. I got a haircut today by the Lane Express by my cousin, and I had just left the barber shop when the police stopped me. I did not show this girl a pistol yesterday. This happened yesterday before 1 p.m. because I went to get my niece out of school early because of the snow. We never left the parking lot by the water tower. I did not ask for a ride. . . . I did ask her for some head and pulled my dick out because she had a tongue ring. She sucked it like once or twice and then stopped. She said she didn't want to do it and sat up and started talking. I put my dick back up and I got up and left. I did not take her phone. I did not force her to suck my dick.

Afterwards, the defendant read and signed the statement.

Less than two hours later, the defendant called Investigator Richardson from booking and asked to give another statement. In the second statement, the defendant said: "I had the gun on me today. I just got the gun today. I got it out of my sister Tamika Green's drawer at 245 Neff [Street]. I did not pull it or point this or any other pistol at anyone. I ain't robbed nobody." The defendant read and signed this statement as well.

After the second statement, the defendant called Investigator Richardson again, and he and Investigator Chestnut interviewed the defendant a third time. The defendant provided the following statement:

> The deal on Monday, I intended on robbing this girl. I thought about it. I had my sister's gun with me. The gun that police caught me with today, I had it in my pants. I did not take anything from the girl on Monday even though I had the gun.

Investigator Richardson testified that the defendant actually told him , "I did that robbery," but then said something different in his statement.

After the conclusion of the proof, the jury convicted the defendant, as charged, of aggravated kidnapping, aggravated rape and aggravated robbery.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the victim's testimony was unreliable and his statements could not be relied on because they "seemed to contradict one another."

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the

weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Relevant to this case, aggravated kidnapping is "false imprisonment" committed "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5). "False imprisonment" is committed when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. 39-13-302(a).

Aggravated rape is "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" Id. § 39-13-502(a)(1). "Sexual penetration" includes "fellatio, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Id. § 39-13-501(7).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Id. §§ 39-13-401(a), -402(a)(1).

In the light most favorable to the State, the evidence established that the defendant

committed the offenses of aggravated kidnapping, aggravated rape, and aggravated robbery. The victim testified that the defendant approached her as she was getting back into her car in a parking lot on the Lane College campus and, while holding a gun in her face, demanded her purse. The defendant then got into the passenger seat of the victim's vehicle and ordered her, at gunpoint, to drive to another location and perform fellatio on him. The victim recalled that the defendant ordered her to "suck [his] dick" and that she would be shot if she refused. Afraid for her life, the victim complied. The defendant eventually left the victim's vehicle, taking items from the victim's purse with him.

The next day, the defendant was arrested in an area near where he first approached the victim, wearing clothing matching the description given by the victim and carrying a loaded gun. The victim identified the defendant from a photographic array as her attacker. Additionally, over the course of three statements to police, the defendant admitted that he talked to the victim in the campus parking lot, was in her car, intended to rob her, and had a gun on him at the time and that the victim performed fellatio on him.

We conclude that the evidence is sufficient for a rational trier of fact to find the defendant guilty of aggravated kidnapping, aggravated rape, and aggravated robbery. Any questions concerning the credibility of the victim's testimony or the defendant's statements to police were resolved by the jury as the trier of fact. The defendant is not entitled to relief.

## II. Sentencing

The trial court conducted a sentencing hearing, at which the State introduced the defendant's presentence report and certified copies of the defendant's prior convictions. Defense counsel pointed out that most of the defendant's prior convictions were misdemeanors or "victimless crime[s]." After hearing arguments from the parties, the trial court sentenced the defendant to twenty years at 100% on the aggravated kidnapping conviction, twenty years at 100% on the aggravated rape conviction, and ten years at 85% on the aggravated robbery conviction. The court ordered that the sentences be served consecutively to each other and to a prior ten-year sentence. On appeal, the defendant challenges the trial court's imposition of consecutive sentences.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood," "[t]he defendant is an offender whose record of criminal activity is extensive," or that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in

which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(1), (2), (4) (2010). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). The criteria listed in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In imposing consecutive sentences, the trial court found that the defendant was a professional criminal who had devoted his life to criminal acts as a major source of livelihood, that he had a record of criminal activity that was extensive, and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4). The court observed that the defendant, who was twenty-one years old at the time of the offenses, had another aggravated robbery conviction, as well as a host of misdemeanor convictions. The court noted that, "considering his age, he has spent quite a bit of time violating the law, and it has been established by a preponderance of the evidence the [d]efendant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood[.]" In determining that the defendant was a dangerous offender, the court found that the circumstances surrounding the commission of the offenses were aggravated, that confinement was necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-social lifestyle, and that the aggregate length of the sentence reasonably related to the offenses for which the defendant was convicted.

We conclude that the record supports the trial court's imposition of consecutive sentences. The presentence report conveyed the defendant's criminal history, which included prior convictions for aggravated robbery, aggravated criminal trespass, vandalism, two counts of criminal trespass, disorderly conduct, as well as a host of driving related offenses. The defendant suggests that his record of criminal activity is not extensive because it consists of primarily misdemeanors. However, this court has previously found that a criminal record consisting of *only* misdemeanors supported imposition of consecutive sentencing. See, e.g., State v. Mira Eva Harris, No. W2010-01481-CCA-R3-CD, 2011 WL 2747293, at *4 (Tenn. Crim. App. July 12, 2011) (upholding consecutive sentencing on basis of extensive criminal history alone where defendant had four prior convictions for driving under the influence as well as other driving related offenses); State v. Steven W. Black, No. E2010-00924-CCA-R3-CD, 2011 WL 208075, at *3 (Tenn. Crim. App. Jan. 13, 2011), perm. app. denied (Tenn. May 25, 2011) (upholding consecutive sentencing on basis

of extensive criminal history alone where defendant had eleven previous misdemeanor convictions and three violations of probation); State v. Edyson Rafael Arias, No. E2005-01700-CCA-R3-CD, 2006 WL 2277667, at *22 (Tenn. Crim. App. Aug. 9, 2006) (upholding consecutive sentencing on basis of extensive criminal history alone where defendant had prior misdemeanor convictions for second degree sexual abuse of a twelve-year-old, second degree unlawful imprisonment, aggravated harassment, and domestic assault); State v. James Clifford Wright, No. 01C01-9811-CC-00476, 1999 WL 994055, at *3 (Tenn. Crim. App. Oct. 29, 1999), perm. app. denied (Tenn. May 22, 2000) (upholding consecutive sentencing on basis of extensive criminal history alone where defendant had two prior driving under the influence convictions, a conviction for driving while his license was suspended, and a speeding conviction). In addition, this court has held that a trial court may consider the offenses for which a defendant is being sentenced in determining whether the defendant has an extensive record of criminal activity for consecutive sentencing purposes. See State v. Daryl Adrian Benjamin Ingram, No. W2002-00936-CCA-R3-CD, 2003 WL 721704, at *3 (Tenn. Crim. App. Feb. 26, 2003), perm. app. denied (Tenn. Sept. 2, 2003). Accordingly, we need not determine whether the trial court was correct in imposing consecutive sentences based on the defendant's being a professional criminal or a dangerous offender, as the defendant's extensive criminal record is alone a sufficient basis for such determination. The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE